UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:22 CR 136 RLW |
| | ) | |
| PHILLIP J. CUTLER, | ) | |
| | ) | |
| Defendant. | ) | |

### UNITED STATES' TRIAL BRIEF

Comes now the United States of America, by and through its attorneys, Sayler A. Fleming, United States Attorney for the Eastern District of Missouri, and Tiffany G. Becker and Zachary M. Bluestone, Assistant United States Attorneys for said District, and submits the following trial brief:

**I.      FACTS**

At trial, the evidence will show that co-defendant Cornelius M. Green, a school principal for the St. Louis Public Schools, paid his childhood friend, defendant Philip J. Cutler, to travel from Oklahoma to St. Louis to kill Green's seven-month pregnant girlfriend, Jocelyn Peters, a 30-year-old third-grade school teacher, and her unborn child.

**A.   The Murder Scene**

On March 24, 2016, at approximately 3:20 p.m., Jocelyn Peters was found deceased in her bed with a single gunshot wound to her head in her home in the Central West End at 4236 W. Pine, Apartment 201, St. Louis, Missouri. Peters was more than 27 weeks pregnant at the time. Her viable fetus (a baby girl, Micah Leigh) was also killed as a result of the gunshot wound. Her married boyfriend and the father of the baby, co-defendant Green, found her and contacted 911, telling the dispatcher his girlfriend had been shot. He told first responders that the front door of the apartment was ajar and that he found Peters where she was and had not touched her.

1

A single .380 caliber spent cartridge casing was located on the floor next to the nightstand. There was material on the bed and floor which was determined to be potato, used as a silencer. A plastic bag of potatoes was found open on the kitchen table in the apartment. No firearm was located.

Peters' apartment was one of 16 units in a secure building apartment building. Two unduplicatable keys were issued to Peters, one of which she gave to Green. Officers from the Evidence Technician's Unit responded and processed the scene. The apartment was overly warm when Peters was found. There were no signs of forced entry, Peters' computer was found near the door, but the only item that was missing from the apartment was her iPhone.

Post-mortem examination and autopsy revealed that Peters and her unborn child died as a result of the gunshot wound to her head. The bullet passed through the left upper eyelid, left eyeball, base of the skull to enter the cranial cavity.

At the scene, co-defendant Green told SLMPD officers he had not spoken to Peters since Wednesday, March 23, 2016, at approximately 6:30 p.m. and had just returned to St. Louis from Chicago via train and that after getting his car from a friend (defendant Cutler), coming straight to Peters' home. Green removed a crumpled train ticket from his pocket to show officers he had just arrived in St. Louis. When asked how he gained access to the secure building, Green produced a key ring that contained his car keys and keys to both the building and Peters' apartment. Green said that to his knowledge only he and the victim had keys to the apartment and that all of the keys were left inside his car in St. Louis while he was in Chicago. Investigators asked Green if they could search his vehicle as it might contain evidence related to the murder. Green became irate and refused stating, "the police always want to suspect the boyfriend."

### B. The Investigation

SLMPD homicide detectives launched a thorough investigation into the murder, during which they interviewed numerous individuals associated with defendant Cutler, Green, and victim Peters. Detectives also obtained numerous search warrants for email and iCloud accounts, cell phone accounts, cell phones, a vehicle, and two residences.

*1. The Plan*

Through their investigation, detectives confirmed Green was in Chicago from Tuesday, March 22, 2016 until Thursday, March 24, 2016, taking an Amtrak train both ways. Before going to Chicago, Green had recently returned from a cruise with Peters and her family. During the cruise, they argued about money. Green told various people multiple different reasons for his trip to Chicago. Video surveillance shows Green exiting the train from Chicago at train station in St. Louis on March 24, 2016, shortly before going to Peters' residence, finding her dead, and calling 911.

Green's old, close friend, to whom he refers to as a brother, defendant Cutler, came from Oklahoma to St. Louis on March 21, 2016 at around 10:30 p.m.—the night before Green left for Chicago. Prior to this trip, in late February and early March, the two communicated via cell phone, with Green arranging for Cutler to be in St. Louis during the week of March 20, 2016, Green and Peters' spring break. On February 29, 2016, Cutler responded to Green, stating that that would work, but asking if Green would be sending the "package." In a subsequent interview, defendant Cutler himself admitted the referenced package contained $2,500 in cash, which he alleged was a loan. Investigators confirmed that Green sent a UPS package from St. Louis to Cutler in Oklahoma on March 7, 2016. Cutler signed for the package.

During the homicide investigation, it came to light that Green, who was the principal of Carr Lane Middle School in the City of St. Louis, was connected to the theft of $2,700 in cash

3

from the middle school dance team competition fund. Green had also engaged in unauthorized school store sales and "dress down" days—both of which generated cash.

   2. *The Days Leading to the Murder*

Location data and receipts confirm that Cutler arrived in St. Louis from Oklahoma on a Greyhound bus on March 21, 2016 at approximately 10:30 p.m. Green picked him up at the station in his white Kia Optima hybrid sedan. Location data showed that Green and Cutler traveled to the immediate area of victim Jocelyn Peters' residence at 4236 W. Pine and remained for more than four minutes. Thereafter, Green and Cutler went to Green's sister's residence where Green would sometimes stay during this period. Green was also staying other places during this timeframe—including the residences of victim Jocelyn Peters, that of another girlfriend (Ann Seeney), and that of his estranged wife (Steffanie Green) and their daughter. Both Green and Cutler remained at Selena Boyd's residence until early the next morning when they took the Kia Optima to the train station so Green could catch the Amtrak train to the Chicago area, specifically Elgin, Illinois.

Both defendants have acknowledged that, once Green left, Cutler was given the Kia Optima to use during his stay in St. Louis. Video surveillance footage was recovered from multiple cameras near Jocelyn Peters' apartment building on March 24, 2016 (the date she was found dead). The most significant footage shows a white Kia Optima turn east onto the 4200 block of West Pine from Boyle Avenue at approximately 2:59 a.m. and exit at approximately 3:25 a.m. The white Kia Optima reenters the 4200 block of West Pine at 3:29 a.m. and again exits at approximately 3:47 a.m. Defendant Cutler committed the murder during that timeframe.

In the time leading up to her death, Jocelyn Peters had recently turned 30 and was approximately 31 weeks pregnant with Green's child. Jocelyn was planning to find a house with Green and live there with him and their baby. Green and Peters had planned a baby shower and

4

were registered for baby gifts. However, during the same time period, another of Green's girlfriends, Ann Seeney, was also planning to marry Green and start a life together. Green also continued to spend time with his estranged wife, Steffanie, who knew Green had a previous relationship with Peters but thought it had ended. Neither Seeney nor Peters knew about the other, nor were they aware of the casual sexual relationship Green was having with his sister's neighbor, LaDonna Hull. Text messages from Green's phones revealed he was having sex with multiple other women as well.

During the investigation, officers conducted multiple interviews of Green, starting at the scene of the murder, where he eagerly provided authorities with his alibi of having been in Chicago. After consenting to a search of his personal and work cell phones and agreeing to provide fingerprints and DNA, Green vehemently and repeatedly refused to consent to search his Kia Optima. While waiting alone in an interview room for detectives for his first interview at the police station, Green called Cutler and his estranged wife to arrange for Cutler to get spare car keys so he could remove Green's Kia from the crime scene. Unbeknownst to Green, the officers had already towed the Kia away from the area of Jocelyn Peters' building. Many of the statements Green made to officers are refuted by other unbiased witnesses and other independent evidence.

Officers interviewed defendant Cutler on two occasions. The first interview took place the night of March 24, 2016, after the police detained defendant Cutler while he was en route to attempt to move the Kia Optima following his conversation with Green. Cutler denied any involvement in the murder and provided a false story as to why he was in St. Louis and what he did while in town. Cutler claimed to have been in St. Louis to visit Green and spend time with his children and visit his father. However, investigation revealed that Cutler spent minimal time with his children and that Green left town less than 12 hours after Cutler arrived. Defendant Cutler

5

granted police consent to look at his recent text messages to and from Green but refused to let them fully examine his phone. After a break in the interview, investigators told Cutler he was being detained for questioning in connection with the murder investigation. When the officers left the interview room, Cutler tore off two pieces of paper from a small notebook he had been carrying in his pocket and ate them. Following the interview, Cutler was released. He returned to Oklahoma by Greyhound bus shortly thereafter.

Investigators continued to pursue a variety of leads, ruling out several potential suspects. They later obtained detailed location information from defendant Cutler's Gmail account and video surveillance of the Kia—both of which put him murder scene between 3-4 a.m. on the night of the murder. Officers then obtained a warrant for Cutler's arrest. Officers traveled to Muskogee, Oklahoma and arrested him on June 9, 2016. During a post-arrest interview, detectives confronted defendant Cutler with the additional evidence developed against him. Cutler's story changed, but he continued to deny involvement in the murder. It was at this time, Cutler admitted that Green had sent him a package containing a $2,500 cash "loan" (in $20s) via UPS from St. Louis, Missouri to Muskogee, Oklahoma. Cutler said this was because Green wanted to see him in St. Louis. Cutler said it was at the last minute that Green told him he was going out of town, but let Cutler use the Kia Optima while he was gone. No one else had access to the Kia at that time. Cutler admitted learning that Jocelyn Peters was pregnant with Green's baby in February 2016, at the same time he was planning his trip to St. Louis.

Officers asked Cutler why the Kia was in the immediate area of Jocelyn Peters' house at 3:00 a.m. on the date of her murder. Cutler insisted he had gone to sleep at 10:00 p.m. that night and had no idea how the Kia Optima got to the location. Officers then confronted Cutler with the fact that his cellular phone was also found to have been located in the immediate area of Peters'

6

home during that timeframe. Defendant Cutler said he must have left his phone in the car and that someone had stolen the Kia temporarily. Officers pointed to the absurdity of Cutler's position that he left his phone in the Kia, someone gained access to it, drove it to the immediate vicinity of Peters' house while she was being murdered, and later returned it and his phone exactly where Cutler had left it. Nor could Cutler explain how or why that individual would have been contacting phone numbers Cutler's associates during that timeframe.

In addition to the evidence outlined above, investigators obtained search warrants on cellphones, email accounts, and developed other evidence linking defendants Green and Cutler to the crimes.

Jocelyn Peters and her unborn child were killed with a .380 caliber firearm. Records from Bullseye Gun Range reveal Green purchased a Taurus .380 caliber handgun on December 24, 2012, and investigators have been unable to locate that weapon. On April 2, 2016, Selena Boyd, Green's sister consented to a search of the residence she shared with Green. During the search, officers located a 9mm handgun in Green's bedroom. Because this weapon did not match the caliber of the murder weapon, officers did not seize it. In a subsequent text message, Green said that investigators did not take his gun because it was not the right caliber despite the fact that the caliber of the murder weapon had not been released publicly.

Investigators also recovered surveillance footage of Green with Jocelyn Peters at an Aldi supermarket on March 20, 2016—just before he left for the trip to Chicago—and the receipt indicates that potatoes were purchased. Potatoes were not included on Jocelyn Peters' preplanned meal list, but a potato was used during the murder as a silencer.

Phone records show minimal and sporadic contact between Green and Cutler prior to Cutler's arrival in St. Louis but reveal a flurry of calls and texts between the two while Green was in Chicago. The two engaged in a seven and a half minute conversation the morning after the

7

homicide and just prior to defendant Cutler's phone traveling to the N. Riverfront Park area where Cutler likely disposed of the murder weapon and Green purchasing his return train ticket so he could "discover" the body.

Additionally, on May 10, 2016, detectives informed Green via phone that they had seized the electronic systems from his Kia Optima pursuant to a search warrant. Shortly thereafter, an employee of Jim Butler Kia called the detective and said he received a phone call from a person identifying himself as Green who asked several questions related to his 2013 Kia Optima. Specifically, Green asked about the tracking information that could be derived from the vehicle and asked several questions related to tracking the location of his vehicle through the electronic recorder.

Moreover, Green admitted to authorities that Jocelyn Peters had been pregnant with his child on two prior occasions. Green's internet history reveal searches related to abortion options coinciding with those pregnancies. Searches related to making or ordering abortion pills, covering bitter taste of pills and how late in pregnancy it can be aborted. Following searches of this nature, Green immediately contacts Cutler. Other incriminatory searches from Green's Google account included topics like: what is needed to charge someone with conspiracy to commit murder; data to be tracked on vehicles; and how long texts are stored. Likewise, defendant Cutler's Google account revealed suspicious searches for a firearm, a new car he wanted to buy after receiving the package of money, a second package received from Green via a third party, and "closest international airport to Tulsa" just days before he was arrested.

The two maintained contact following the homicide and Green paid for Cutler's jail calls and commissary items. During phone calls, Cutler and Green do not discuss innocence, but instead staying together. In sum, the evidence will conclusively establish that Green hired defendant Cutler to kill victim Jocelyn Peters and her unborn baby girl, Micah Leigh.

8

## II. LEGAL ISSUES

### A. Elements of the Offense

Count One charges defendants with conspiracy to commit the murder for hire of Jocelyn Peters and her unborn child. The elements of that offense, 18 U.S.C. § 1958, are:

*One*, two or more persons reached an agreement or came to an understanding to travel in interstate commerce or use facilities of interstate commerce, including but not limited to United Parcel Service, credit cards and cellular telephones, and

*Two*, the defendants voluntarily and intentionally joined in the agreement or understanding either at the time it was reached or at some later time while it was still in effect; and

*Three*, at the time the defendants joined the agreement or understanding, they knew the purpose of the agreement or understanding; and,

*Four*, while the agreement or understanding was in effect, the defendants or one or more other persons who had joined in the agreement knowingly traveled or caused another to travel in interstate commerce or used or caused another to use a facility of interstate commerce, including but not limited to United Parcel Service, credit cards or cellular telephones, for the purpose of carrying out or carrying forward the agreement or understanding.

*See United States v. Basile, et al*, 109 F.3d 1304 (8th Cir. 1997); *United States v. Cannon*, 475 F.3d 1013 (8th Cir. 2007); *United States v. Hyles*, 521 F.3d 946 (8th Cir. 2008).

Count Two charges defendants with the substantive crime of murder for hire of both Jocelyn Peters and her unborn child, in violation of 18 U.S.C. § 1958. The elements of that crime are:

*One*, that a person at or about the time charged in the Indictment traveled or caused another to travel in interstate commerce or used or caused another to use any facility of interstate commerce; and

9

*Two*, that the travel in interstate commerce or use of any interstate facility was done with the intent that a murder be committed in violation of the laws of the State of Missouri; and

*Three*, that anything of pecuniary value was received or promised or agreed to be paid as consideration for the murder; and

*Four*, the death of Jocelyn Peters or her unborn child resulted.

*See United States v. Basile, et al.*, 109 F.3d 1304 (8th Cir. 1997); *United States v. Cannon*, 475 F.3d 1013 (8th Cir. 2007); *United States v. Hyles*, 521 F.3d 946 (8th Cir. 2008).

    **B.**    **Coconspirator Statements and Admissions**

The United States will offer evidence of coconspirator statements made in furtherance of this drug conspiracy. Moreover, some of the statements also will be offered as direct admissions and/or adoptive or tacit admissions.

The Federal Rules of Evidence provide that a statement is not hearsay when it "is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E); *see also United States v. Young*, 753 F.3d 757, 771 (8th Cir. 2014); *Bourjaily v. United States*, 483 U.S. 171, 173 (1987). To qualify for this exclusion, the Government must establish by a preponderance of the evidence, "(1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy." *United States v. Blakeney*, 876 F.3d 1126, 1134 (8th Cir. 2017) (quoting *United States v. Beckman*, 222 F.3d 512, 522 (8th Cir. 2000)).

In *United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir. 1978), the Eighth Circuit established a procedure for the district court to employ when faced with a co-conspirator's statement. In part, the *Bell* Court stated:

> If the prosecutor propounds a question which obviously requires a witness to recount an out-of-court declaration of an alleged coconspirator, the court, upon a timely and appropriate objection by the defendant may conditionally admit the statement.

573 F.2d at 1044. "A court may conditionally admit a challenged statement subject to later proof to satisfy the coconspirator rule and defer a final ruling on admissibility until after hearing the relevant evidence." *United States v. Roach*, 164 F.3d 403, 409 (8th Cir. 1998).

For a coconspirator's statement to be admissible at trial, the existence of the conspiracy and the defendant's and declarant's complicity in it must be proved by a preponderance of evidence. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). In *Bourjaily*, the Supreme Court held that a court may consider the hearsay statements themselves for the purpose of making the preliminary factual findings required by Rule 801(d)(2)(E). *Id*. at 178; *see also United States v. Ragland*, 555 F.3d 706, 713 (8th Cir. 2009). In addition, the necessary preliminary findings may be supported completely by circumstantial evidence, or a defendant's own conduct and admissions. *Bourjaily*, 483 U.S. at 181; *see also United States v. Townsley*, 843 F.2d 1070, 1084 (8th Cir. 1988).

The language "during the course and in furtherance of the conspiracy" has been afforded a broad construction under Rule 801(d)(2)(E). *Ragland*, 555 F.3d at 713 (8th Cir. 2009); *United States v. Cazares*, 521 F.3d 991, 999 (8th Cir. 2008). Since the statements must do more than inform but advance the objectives of the conspiracy, the nature of the statements, along with when and under what circumstances they were made, must be considered. *United States v. Mayberry*, 896 F.2d 1117, 1121 (8th Cir. 1990); *Ragland*, 555 F.3d at 713. Accordingly, the "in furtherance" requirement is satisfied where the statement in question furthers in any way the objectives of the conspiracy. *United States v. Manfre*, 368 F.3d 832, 838 (8th Cir. 2004); *United States v. Guerra*, 113 F.3d 809, 814 (8th Cir. 1997).

The statements in this case involve text messages between defendant Cutler and Green as well as text messages between Cutler and others and Green and others (including the victim, Jocelyn Peters). These messages demonstrate the motive for the crime of murder-for-hire and explain the advent of the conspiracy. Significantly, as this Court has already ruled (without objection from defendant Cutler), the defense will not be permitted to elicit on cross-examination or offer in its own case self-serving hearsay statements. *See* Doc. 111.

C.  **Expert Witness Testimony**

Under Federal Rule of Evidence 702, a qualified witness may testify as an expert, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Here, the United States has filed a detailed disclosure of the expert witness testimony it plans to offer. Defendant Cutler has no objection to these experts and does not intend to offer any expert testimony of his own.

D.  **Audio Recordings and Transcripts**

At trial, the Government will also be introducing lawfully recorded interviews and telephone conversations.

1.  **Excerpt Calls/Recordings**

As to the recordings, their audibility is good, but they are extremely lengthy. Accordingly, the Government plans to admit into evidence only limited relevant portions of the recordings. In some instances, the Government will simply solicit testimony from law enforcement summarizing portions of statements.  Such excerpts and summary testimony about the same are appropriate. Fed. R. Evid. 1006; *United States v. Segines*, 17 F.3d 847 (6th Cir. 1994); *United States v. Denton*, 556 F.2d 811, 815-16 (6th Cir. 1977) and cases cited therein.  *See* 5 WEINSTEIN'S EVIDENCE, p. 1006(06).

12

### 2. Authenticity of Recordings

The Eighth Circuit in *United States v. McMillan*, 508 F.2d 101, 104 (8th Cir. 1974), set forth a *prima facie* test to establish the authenticity of electronic surveillance. This prima facie test includes seven foundation guidelines, where the Government must show that:

> (1) That the recording device was capable of taking the conversation now offered in evidence.
> (2) That the operator of the device was competent to operate the device.
> (3) That the recording is authentic and correct.
> (4) That changes, additions or deletions have not been made in the recording.
> (5) That the recording has been preserved in a manner that is shown to the court.
> (6) That the speakers are identified.
> (7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

*Id.* The elements of this test are not rigid but applied with flexibility based on common sense. *United States v. Webster*, 84 F.3d 1056, 1064 (8th Cir. 1996); *United States v. Roach*, 28 F.3d 729, 733 (8th Cir. 1994). In *United States v. Scully*, 546 F.2d 255, 269 (9th Cir. 1976), the court dealt with the question of whether the Government could make its *prima facie* authenticity showing without producing all of the monitoring agents. In this decision, the court held that this was permissible when agents with knowledge of the surveillance testified. *Id.*

### 3. Use of Transcripts

The Government plans to introduce transcripts of all of the conversations played. All transcripts have been provided to the defense in total many months ago, and the transcripts of the specific clips intended to be played have been furnished to the defense more recently. The defense has indicated no issues with the accuracy of the transcripts.

In the Eighth Circuit, the decision to allow the use of transcripts to assist jurors in listening to a tape recording lies within the sound discretion of the district judge. *United States v. Chavez-Alvarez*, 594 F.3d 1062, 1069 (8th Cir. 2010); *see also United States v. Placensia*, 352 F.3d 1157,

1165 (8th Cir. 2003) (noting trial court's discretion to admit transcripts of foreign language transcripts even without tape recordings). Transcripts in the jury room will generally not be considered cumulative when they assist the jury in evaluating the evidence. *Id*. at 1069.

The use of transcripts aids the jury in a number of ways. First, transcripts help the jurors follow often poor-quality recordings. *United States v. Riascos*, 944 F.2d 442, 443 (8th Cir. 1991). These transcripts also help the jurors identify speakers. *United States v. Henneberry*, 719 F.2d 941, 949 (8th Cir. 1983). Additionally, transcripts assist the jury when portions of the recording are inaudible. *United States v. Willis*, 774 F.2d 258, 259 (8th Cir. 1985). Finally, transcripts also aid the jury in understanding colloquialisms in the conversation. *United States v. Delpit*, 94 F.3d 1134, 1148 (8th Cir. 1996). Because each of these considerations apply in the case at bar, the jury should be allowed access to the transcripts of all conversations played.

The trial court should allow the use of transcripts only after each party has had an opportunity to verify the accuracy of the recordings and provide their own transcript. *United States v. Britton*, 68 F.3d 262, 264 (8th Cir. 1995). The person who prepared the transcript may testify that that they listened to recordings and accurately transcribed their contents. *United States v. Bentley*, 706 F.2d 1498, 1507 (8th Cir. 1983); *United States v. Frazier*, 280 F.3d 835, 849 (8th Cir. 2002). However, the Eighth Circuit does not mandate that the foundation for the transcripts be laid by the person who prepared the transcripts, but it may be established by a person who was a party to the conversations. *United States v. Gordon*, 688 F.2d 42, 44 (8th Cir. 1982); *Frazier*, 280 F.3d at 849-50.

The Court must instruct the jury that differences in meaning may be caused by such factors as the inflection in a speaker's voice or inaccuracies in the transcript and that "any discrepancies [from the transcript] should be resolved in favor of what they heard on the tapes." *United States*

14

*v. Scott*, 243 F.3d 1103, 1107 (8th Cir. 2001). However, once admitted into evidence and given the proper cautionary instruction, the transcripts may be used by the jury in their deliberations. *United States v. Foster*, 815 F.2d 1200, 1203 (8th Cir. 1987); *Chavez-Alvarez*, 594 F.3d at 1069.

### 4. Joint Presentation of Audio & Transcripts

The Government intends to play the audio of telephone calls while a rolling transcript of the call appears on the court monitors. There will be a highlighted portion of text rolling and synched to the audio file. This is an aid to assist the jury in identifying the speakers and following the conversation.

## IV. CONCLUSION

The foregoing are facts and issues that the United States expects to arise in the trial of this matter.

Respectfully submitted,

SAYLER A. FLEMING
UNITED STATES ATTORNEY


*/s/ Tiffany G. Becker*
TIFFANY G. BECKER #46314MO
ZACHARY M. BLUESTONE #69004MO
Assistant United States Attorneys
111 South Tenth Street, 20th Floor
St. Louis, Missouri 63102
(314) 539-2200

CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2024, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

                                              *s/Tiffany G. Becker*
                                              TIFFANY G. BECKER #46314MO
                                              Assistant United States Attorney